**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VINCENT R. DEPINTO and DEPINTO DRYWALL & PAINTING, INC., | ) ) ) | |
| Plaintiffs, | ) ) | No. 07 CV 2384 |
| v. | ) ) | Judge Joan H. Lefkow |
| THE SHERWIN-WILLIAMS CO. and PULTE HOLMES, INC., | ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Vincent R. DePinto and DePinto Drywall & Painting ("DePinto Drywall") (collectively, "plaintiffs") filed an amended complaint against The Sherwin-Williams Company ("Sherwin-Williams") and Pulte Homes, Inc. ("Pulte") (collectively, "defendants") seeking money damages relating to work that DePinto Drywall performed at Pulte's Winchester Glen housing development. The amended complaint alleges that Sherwin-Williams sold defective paint to DePinto (Counts I and II), that Pulte breached its contract with DePinto Drywall by refusing to pay for the costs DePinto Drywall incurred as a result of having to repair damage caused by the defective paint (Count III), that Sherwin-Williams and Pulte damaged DePinto Drywall's reputation by making defamatory statements regarding DePinto's work at Winchester Glen (Count IV), that Sherwin-Williams and Pulte intentionally interfered with DePinto Drywall's relationships with its customers (Count V), and that Sherwin-Williams and Pulte intentionally caused emotional distress to DePinto by making false statements regarding DePinto Drywall's work and refusing to pay for the work done by DePinto Drywall (Count VI). Defendants have

filed motions for summary judgment with respect to Counts IV, V, and VI. *See* Dkt. Nos. 184,

187.  For the reasons stated below, the motions are granted.

## BACKGROUND[1]

DePinto Drywall is an Illinois corporation that is in the business of installing drywall and

painting new homes.  DePinto Drywall is owned by Mariella DePinto, the wife of plaintiff

Vincent DePinto.  Mariella DePinto manages DePinto Drywall's office, which includes

overseeing the company's books, payroll, and invoices.  Vincent DePinto manages DePinto

Drywall's painting operations in the field.  Pulte is a Michigan corporation with its principal

place of business in Bloomfield, Michigan.  Pulte's business includes building and selling

houses.  Sherwin-Williams is an Ohio corporation with its principal place of business in

Cleveland, Ohio.  Sherwin-Williams manufactures and sells paint.  This court has jurisdiction

under 28 U.S.C. § 1332 and venue is proper under 28 U.S.C. § 1391(a).

## I.      The Paint Problems at Winchester Glen

In February of 2006, DePinto Drywall was working under contract with Pulte to paint

approximately 300 homes at Pulte's Winchester Glen development in Carpentersville, Illinois.

Pursuant to a national contract with Sherwin-Williams, Pulte informed DePinto Drywall that it

would need to use Sherwin-Williams paint on the homes at Winchester Glen.  The first paint

[1] The parties have objected to numerous statements of fact as not complying with Local Rule 56.1.
(Sherwin-Williams alone moves to strike 100 out of plaintiffs' 150 statements of additional fact.)  The
parties have also filed lengthy denials to many of the statements asserted by their opponents.  The court
includes in the background section only those portions of defendants' statements and plaintiffs' responses
that are appropriately presented, supported, and relevant to the resolution of this motion. The facts are
taken in the light most favorable to plaintiffs, the non-moving parties.  The court will address the parties'
objections to statements of fact that are material to the pending motions in the "Discussion" section of this
opinion.

selected for use at Winchester Glen was a product known as "Builder's Solution," denoted by the formula number A61W7011. Later, a different paint product, labeled "Pulte Homes Interior Latex Flat" and denoted by the formula number B30WJ6901 (the "6901 paint" or "Showcase Plus"), was substituted in place of Builder's Solution.[2] The 6901 paint was first delivered to the Winchester Glen development in May of 2006. Not long afterwards, "microcracking" and catastrophic peeling were observed in a number of the homes at Winchester Glen that had been painted with the 6901 paint. Repairs were required, and Pulte began to have problems closing homes on schedule at Winchester Glen. Pulte also had to move some homeowners out of their homes and provide alternate housing while the repair work was being performed.

Sherwin-Williams initiated an investigation to determine the cause of the problems at Winchester Glen. As part of the investigation, Sherwin-Williams conducted lab analysis of the 6901 and other paints and attempted to duplicate the cracking in the lab. Sherwin-Williams also developed a prototype paint product as part of its efforts to duplicate and resolve the cracking and sent different test products to DePinto Drywall to be used at Winchester Glen. In addition, Sherwin-Williams examined the way in which the 6901 paint had been applied in the field, which included measuring the thickness of the paint that had been applied to various homes. The measurements from the field were then compared to Sherwin-Williams's paint application

---

[2] The parties dispute whether the 6901 paint was requested by Pulte or was selected by Sherwin-Williams as a substitute product after Pulte noticed problems with the Builder's Solution paint. *See* Pls.'s Resp. to Def. The Sherwin-Williams Company's Stmt. of Undisputed Material Facts and Revised Stmt. of Additional Facts ("Pls.' Resp. to S-W's Stmt."), at ¶ 9. This fact is not material to resolving the pending motions.

guidelines, which initially recommended 6–8 wet mils[3] per coat and were later revised to recommend 5–7 wet mils per coat.[4] Preliminary reports of the lab testing, discussed in emails among Sherwin-Williams personnel in July 2006, suggested that "[a]pplication at various thickness did not correlate to [the] amount of cracking in the film" and that "[h]igh film build contributes to the cracked appearance but is not the root cause" of the cracking. *See* Plaintiffs' Revised Stmt. of Additional of Fact ("Pls.' Stmt."), at ¶¶ 41, 42; Pls.' Exs. 53, 55, 57. As the investigation continued, Sherwin-Williams's lab technicians concluded that high film build contributed "very significantly" to the cracking appearance of the 6901 paint and "was more likely the root cause" than had been understood in July 2006. DePaulo Dep. 123:12–18; *see also id.* at 110:14–18. As of the fall of 2006, Sherwin-Williams's "position" was that "high film build along with potentially humidity and other factors caused the cracking." Kaufmann Dep. 246:18–20.

DePinto Drywall maintained that it had applied the paint correctly and pursuant to Sherwin-Williams's specifications. Sherwin-Williams also monitored the paint thickness as many of the houses were being painted by DePinto Drywall. *See* Burns Dep. 95–96. By August 2006, however, Pulte began to question why contractors at other Pulte developments had not experienced the same type or scope of problems with the 6901 paint. When some Pulte employees asked Sherwin-Williams employees whether other contractors were having problems

---

[3] The thickness at which paint is applied is measured in millimeters, commonly referred to as "mils." The dry film thickness of the 6901 product is approximately one third of its wet film thickness application.

[4] The date when Sherwin-Williams issued its revised guidelines is in dispute. *See* Pls.' Resp. to S-W's Stmt. ¶ 23. This fact is not material to resolving the pending motions.

with the 6901 paint, they were told that the catastrophic peeling and cracking was limited to Winchester Glen.

On September 18, 2006, Sherwin-Williams executives Mark Henderson, Dennis Karnstein, and Steve Revnew met with Pulte executives over dinner. Henderson Dep. 100:3–11. In preparation for the meeting, Sherwin-Williams's lab technicians prepared a report titled Pulte Homes Investigation (the "Pulte Investigation Report"). The Pulte Investigation Report contained micrographs, spreadsheets, and paint chip and drywall samples to illustrate the findings of Sherwin-Williams's investigation of the complaints it had received from contractors for Pulte in the Chicago area. *See* Pls.' Ex. 149; S-W Ex. 82.[5] At the meeting, the representatives from Sherwin-Williams discussed the fact that the 6901 paint had been applied more thickly than Sherwin-Williams recommended. Henderson Dep. 102:2–103:2.

On September 21, 2006, Jeffrey Kaufmann, the wholesale marketing director for Sherwin-Williams, met again with Pulte representatives. Kaufmann displayed several micrographs that purported to show the thickness of paint samples taken from Winchester Glen. Kaufmann also showed micrographs and paint samples from lot 134 at Winchester Glen and said that the paint at lot 134 was at least 12 mils dry and had been applied in excess of Sherwin-Williams's recommendations. The next day, John Martinie, the former trim superintendent for Pulte, wrote a follow-up email about the meeting to Bernard Pallardy, the vice president of land development for Pulte. Martinie stated that he had tested the paint in lot 134 and had concluded

---

[5] The copy of the Pulte Investigation Report submitted by plaintiffs is incomplete because it is missing Section IV, *see* Pls.' Ex. 149, which is the section that included many of the paint samples that showed thicknesses that exceeded the recommended mils. The court has reviewed the complete copy of the Pulte Investigation Report that has been submitted by Sherwin-Williams. *See* S-W Ex. 82.

that "there is no way the paint cracking in this home is 12 mils dry like Mr. Kaufmann claimed yesterday." Martinie Dep. 156:23–157:24.

On October 2, 2006, Vincent DePinto met with representatives from both Sherwin-Williams and Pulte at Pulte's offices in Elgin. Steve Revnew, who worked in the labs at Sherwin-Williams, discussed the lab testing that Sherwin-Williams had performed on the samples taken from Winchester Glen. He stated that in many instances the paint measured at more than 20 mils dry film thickness, which he characterized as "not even close" to Sherwin-Williams's specifications. Revnew passed around micrographs that had been taken from lots 116 and 118 at Winchester Glen and which showed that the paint had been measured at 18–23 mils dry film thickness. Kaufman was also present at the meeting. Kaufmann told James Coffey, a Pulte employee, "This is the situation here: Mr. DePinto's crews are not applying the paint properly. As you can see from the analytical reports and the microscopy, they are applying it too thick – and the microscopy doesn't lie." *Id.* ¶ 94. DePinto said to Kaufmann, "I've used multiple Sherwin-Williams products for years, including at the Winchester site, without issue. Are you telling me that we don't know how to paint?" Kaufmann replied, "Yeah, Mr. DePinto." *Id.* ¶ 98. Kaufmann also stated that "Mr. Depinto overcharged Pulte" by $60,000 to $80,000 for the repairs. *Id.* ¶ 93.

## II.     DePinto Drywall's Repair Work For Pulte

DePinto Drywall was required to do extensive repair work on several homes that were painted with the 6901 paint product at Winchester Glen. It is currently seeking contractual damages of approximately $240,000 for repair work performed on approximately 38 homes.

On October 23, 2006, Vincent DePinto met with Pallardy and Schmit, the former director of purchasing for Pulte, to discuss DePinto Drywall's outstanding invoices to Pulte. DePinto informed Pallardy that he had already paid his labor costs for his workers and that DePinto Drywall would be out of business if Pulte did not pay DePinto Drywall's outstanding invoices. DePinto also stated that he had borrowed money on a line of credit to pay his employees' labor costs and that he needed the money immediately. Pallardy told Vincent DePinto, "Well, we are gonna need our hundred grand back or you will have to reimburse Pulte for the costs associated with moving homeowners into hotels so that their homes could be repaired." *Id.* ¶ 116. Pallardy stated, "The little guy always gets squeezed. You are not the first and you won't be the last. You had better bow down. This is bigger than you and me both, and you can't fight two multi-million dollar companies because we will bury you." *Id.* ¶ 120.

On April 30, 2007, Vincent DePinto received a faxed copy of a check from Pulte that stated that DePinto Drywall's checks were ready to be picked up at the Chicago Title Company in Wheaton, Illinois. On May 1, 2007, Mariella DePinto went to the Chicago Title Company to pick up the checks. When she arrived, she was told that the checks had been sent back to Pulte at its request.

## III. DePinto Drywall's Relationship With Other Contractors And Its Customers

DePinto Drywall's contracts with several other customers were terminated or rebid after the problems at Winchester Glen occurred. In early 2007, Vincent DePinto called several builders that DePinto Drywall had worked with for years, including Kirk Homes, Centex, Pasquinelli, and Pulte. His phone calls were not returned. Every non-party builder that was

deposed in this litigation, including Kirk Homes and Centex, has testified that it awarded the contracts to a different painting or drywall company because of the need to reduce costs.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id*. While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id*. at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## DISCUSSION

### I.      Defamation - Count IV

Count IV of plaintiffs' complaint alleges a claim for defamation against Sherwin-Williams and Pulte on behalf of DePinto Drywall. In order to succeed on a defamation claim, a plaintiff must demonstrate that the defendant made a false statement about the plaintiff, that the

statement was published to a third party, and that the publication of the false statement caused damage to the plaintiff. *See, e.g.*, *Krasinski* v. *United Parcel Serv., Inc.*, 530 N.E.2d 468, 471, 124 Ill. 2d 483, 125 Ill. Dec. 310 (1988). If a statement is defamatory *per se*, then a plaintiff does not need to prove special damages. *See, e.g.*, *Gardner* v. *Senior Living Sys., Inc.*, 731 N.E.2d 350, 354, 314 Ill. App. 3d 114, 246 Ill. Dec. 822 (2000). Among the categories of statements that are considered defamatory *per se* are words that impute that a person is unable to perform or lacks integrity in performing his employment duties and words that impute that a person lacks ability in his profession. *See, e.g.*, *Quality Granite Constr. Co., Inc.* v. *Hurst-Rosche Eng'rs, Inc.*, 632 N.E.2d 1143, 261 Ill. App. 3d 21, 198 Ill. Dec. 528 (1994). Sherwin-Williams and Pulte are liable for the defamatory statements of their employees under the doctrine of *respondeat superior*. *See Reed* v. *Nw. Publ'g Co.*, 530 N.E.2d 474, 484, 124 Ill. 2d 495, 125 Ill. Dec. 316 (1988); *Haywood* v. *Lucent Techs., Inc.*, 169 F. Supp. 2d 890, 915 (N.D. Ill. 2001).

The Constitution and Illinois law provide several defenses to a defamation claim, three of which are relevant here. First, a statement may be opinion protected by the First Amendment if it "cannot be reasonably interpreted as stating actual fact." *Solaia Solaia Tech., LLC* v. *Specialty Publ'g Co.*, 852 N.E.2d 825, 840, 221 Ill. 2d 558, 304 Ill. Dec. 369 (2006). To determine whether a statement is protected opinion, courts look to "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Id.* Second, a statement is not actionable if it is capable of an innocent construction. This requires that "considered in context, with the words and the implications therefrom given their natural and obvious meaning . . . the

statement may reasonably be innocently interpreted." *Pope* v. *Chronicle Publ'g Co.*, 95 F.3d 607, 613 (7th Cir. 1996) (quoting *Mittelman* v. *Witous*, 552 N.E.2d 973, 979, 135 Ill. 2d 220, 142 Ill. Dec. 232 (1989), *abrogated on other grounds by Kuwik* v. *Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 156 Ill. 2d 16, 188 Ill. Dec. 765 (1993)).  Third, the statements may be protected by a qualified privilege.  A qualified privilege may exist where the situation involves an interest of the person who publishes the defamatory statement or an interest of the person to whom the matter is published.  *Kuwik*, 619 N.E.2d at 135.  If the statement is protected by a qualified privilege, the plaintiff must demonstrate that the defendant abused the privilege by providing evidence that the defendant displayed a "reckless disregard" as to whether the statement was false.  *See Vickers* v. *Abbott Labs.*, 719 N.E.2d 1101, 1108, 308 Ill. App. 2d 393, 241 Ill. Dec. 698 (1999).  "Reckless disregard" means that the defendant either knew the statement was false, or had a high degree of awareness that the statement was false, or entertained serious doubts about the truth of the statement but failed to properly investigate the truth.  *Dawson* v. *New York Life Ins. Co.*, 135 F.3d 1158, 1167 (7th Cir. 1998).[6]

### A.    Defamation Claim Against Sherwin-Williams

DePinto Drywall assert that Sherwin-Williams's employees made three types of false statements to Pulte: (1) statements that the cracking problem with the 6901 paint had only occurred at Winchester Glen, (2) statements that the problems at Winchester Glen were caused by DePinto Drywall's application of the 6901 paint at thickness levels that exceeded Sherwin-Williams's specifications, and (3) statements that Vincent DePinto overcharged Pulte for repairs

---

[6] Where there is no qualified privilege, a plaintiff need only show defendant acted negligently in making the defamatory statement.  *Dawson*, 135 F.3d at 116 (citing *Kuwik*, 619 N.E.2d at 133).

done at Winchester Glen. In their statement of additional facts, however, plaintiffs include numerous irrelevant statements that are most likely intended to support their defamation claims against Sherwin-Williams. Sherwin-Williams has moved to strike these statements, and the court will briefly address them here. Paragraphs 9 and 10 of plaintiffs' statement concern the details of Sherwin-Williams's national contract with Pulte, which is not at issue in this summary judgment proceeding. Paragraphs 12 and 14–26 concern alleged defects of the 7011 paint, also referred to as "Builder's Solution," which was the paint used at Winchester Glen prior to the 6901 paint. The alleged defects of the 7011 paint are not relevant to plaintiffs' defamation claim, which is premised upon allegations that defendants repeatedly and falsely stated that the problems with the 6901 paint at Winchester Glen were due to DePinto Drywall's application procedures. *See* Am. Compl. at ¶¶ 33–37, 65; Pls.' Mem. (Revised) In Opp. to Defs.' Mot. for Summ. Jgmt. ("Pls.' Mem."), at 14 ("As to Sherwin-Williams, the evidence demonstrates that it repeatedly told Pulte that the cracking problem *with the Showcase Plus* at Winchester were [*sic*] not happening anywhere else. In fact, those individuals knew that the *Showcase Plus* was cracking on multiple jobs with multiple painters."), 15 (describing "fake test results" that related to the Showcase Plus paint). The 7011 paint is likewise irrelevant to plaintiffs' claims for tortious interference with prospective economic advantage and intentional infliction of emotional distress. *See* V. DePinto Dep. 80:9–17.[7] Paragraph 43, which asserts facts regarding an

---

[7] At Vincent DePinto's deposition, the following exchange occurred:

| | |
|---|---|
| Q: | Were you–you were compensated for the repaint [of the 7011 paint]; is that correct? |
| A: | Yes. |
| Q: | So that's not an issue in this lawsuit, is that? |
| A: | The 7011? |
| Q: | Yes. |

(continued...)

unspecified batch of paint at Sherwin-Williams's Garland plant, and ¶ 44, which asserts that one of Sherwin-Williams's paint analysts feared being blamed for product failures, are also irrelevant. For these reasons, paragraphs 9–10, 12, and 14–26 will be stricken. *See* Fed. R. Evid. 401, 402.

Sherwin-Williams asserts, as a threshold issue, that the statements attributed to its employees are protected by a qualified privilege. DePinto Drywall does not contest this. It is clear that Sherwin-Williams had an interest in performing its contractual obligation to provide paint products to Pulte for use at Winchester Glen. Pulte also had an interest in receiving a usable product and in having its homes painted properly and closed on schedule. These facts are sufficient to establish that a qualified privilege exists. *See Vickers*, 719 N.E.2d at 1108. Accordingly, DePinto Drywall must prove that Sherwin-Williams's employees abused the qualified privilege in order for the statements attributed to them to be actionable. *Id.* DePinto Drywall may not, however, "circumvent the . . . requirement . . . by pooling all of the information arguably within the knowledge of various employees and imputing all of that knowledge to the corporate defendant to establish that the corporate defendant acted with actual malice." *Reed*, 530 N.E.2d at 484.[8] Therefore, in order for Sherwin-Williams to be held liable for defamation, DePinto Drywall must present evidence of malice that is specific to the employee who made the defamatory statement. *See id.*; *see also Miller* v. *Danville Elks Lodge*

---

[7](...continued)
       A:     No. We were compensated for the 7011. We were not for the failure of the 6901.

[8] *Reed* considered whether a defendant newspaper's statements were actionable under the "actual malice" standard. This is the same standard the court uses to determine whether the qualified privilege was abused. *See, e.g.*, *Qaulity Granite*, 632 N.E.2d at 1143–44.

*332, P.B.O.E.*, 569 N.E.2d 1160, 1167, 211 Ill. App. 3d 145, 155 Ill. Dec. 549 (1991) ("The court should focus on the defendant's subjective state of mind . . . .").

### 1. Statements Regarding The Paint Problems At Other Developments

Michael Baggio, the former project manager for Pulte at Winchester Glen, testified that soon after Pulte began to experience paint problems at Winchester Glen he asked Carrie Abbett, the Chicago area builders representative for Sherwin-Williams, whether the cracking was occurring anywhere else. He testified that "[Abbett] told me that there were not problems in other places, that this was a Winchester-specific situation." Baggio Dep. 125:11–12. Michael Hausler, the area construction manager for Pulte, similarly testified that he asked various Sherwin-Williams employees whether the 6901 paint was cracking at other communities. Hausler testified that Abbett, Kaufmann, and Marge Jones, Sherwin-Williams's national account manager for homebuilders, told him that they were "not seeing this anywhere else." Hausler Dep. 167:12–24.[9]

The statements attributed to Abbett, Kaufmann, and Jones are not actionable because they are capable of an innocent construction. The natural and obvious meaning of the statements described in Baggio's and Hausler's testimony is simply that other developments had not encountered comparable problems with the 6901 paint. The statements do not mention DePinto Drywall or discuss application of the paint or causes of the cracking paint. Both Pulte and

---

[9] Sherwin-Williams moves to strike Baggio and Hausler's testimony on the grounds that it is immaterial to plaintiffs' tort claims and is based on hearsay. *See* Sherwin-Williams's Resp. to Plaintiffs' Revised Statements of Additional Fact ("S-W Resp. to Pls.' Stmt."), at ¶¶ 47, 48. The testimony is relevant to plaintiffs' defamation claims and is not hearsay. *See Porter* v. *Bankers Life & Cas. Co.*, No. 01 C 6183, 2003 WL 22416702, at *2 (N.D. Ill. Oct. 22, 2003) ("[T]he testimony of someone who heard the defendant make an allegedly defamatory statement is not hearsay . . . ."); *Schindler* v. *Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007); *Bularz* v. *Prudential Ins. Co. of America*, 93 F.3d 372, 377 (7th Cir. 1996). Sherwin-Williams's motion to strike is denied.

13

Sherwin-Williams were conducting a survey of the problem and it is reasonable to conclude that Sherwin-Williams's statements did not, on their face, concern DePinto Drywall or Vincent DePinto.[10] *Cf. Quality Granite*, 632 N.E.2d at 1142 (letter stating that contractor "may be considered in default" was not capable of innocent construction because the letter referenced contractor's "failure to complete the project in a timely manner, substandard workmanship, reluctance to complete punch list items and inability to correctly interpret the contract documents"). These statements do not support DePinto Drywall's defamation claim against Sherwin-Williams.

Vincent DePinto, in his affidavit, testifies that on September 6, 2006, he met with employees of Sherwin-Williams and Pulte at Pulte's Del-Webb development in Huntley, Illinois. Kaufmann pointed to a house on Lot 62 and told Pallardy and Schmit, "This house looks pretty good doesn't it? This is the way a house should be done. You guys know we're committed to you and your painting contractors. Obviously, there isn't a problem here like at Winchester. Ecker [another contractor] and everyone else has been using this product without issues. But we want to work with all your painters and we're trying very hard to find a product that will work for Mr. DePinto." V. DePinto Aff. ¶ 68.[11]

---

[10] Indeed, when Hausler was asked, "what was the significance of their statements to you?" he replied, "We're not seeing this anywhere else." Hausler Dep. 168:4–6. Plaintiffs' counsel then asked, "Well, did that lead you to believe that the problem was probably DePinto?" Hausler responded, "I don't know. . . . I try to keep an open mind until I got a smoking gun, right, and I still don't have the smoking gun. So I can't answer your question. . . . I mean, there's got to be overwhelming evidence that says 'this is it.' And so . . . still to this day, I don't know why this is only happening at Winchester to this level." *Id.* at 168:15–169:1.

[11] Kaufmann denies that he made these statements. *See* S-W Resp. to Pls.' Stmt. ¶ 69; Kaufmann Decl. ¶ 4. For the purpose of deciding defendants' motions for summary judgment, however, the court must view any disputed material fact in the light most favorable to plaintiffs.

Kaufmann's statement that "everyone else" had used the 6901 paint "without issues" is specific enough to constitute defamation *per se*. By stating that "everyone else" had used the 6901 paint without issues, Kaufmann suggested that DePinto Drywall was doing something differently from other contractors and that this was the cause of the paint problems at Winchester Glen. The context of Kaufmann's statement would have made clear that the phrase "without issues" referred to the fact that the paint did not crack when applied by other painters. In addition, Kaufmann could have been understood to be in possession of information that would support the truth of his statement. *Cf. Chicago Conservation Ctr.* v. *Frey*, 40 Fed. App'x 251, 256–57 (7th Cir. 2002) (conservation consultant's statements regarding the possible cause of damage to customer's artwork were nonactionable opinion where consultant "could not have been understood to claim that he was in possession of any objectively verifiable facts when he made the statements"); *Hach* v. *Laidlaw Transit, Inc.*, No. 02 C 996, 2004 WL 2966946, at *3–6 (N.D. Ill. Nov. 24, 2004) (statements that plaintiff's employment was terminated because his management was "waning" and he had caused "disruption" were not objectively verifiable and were non-actionable opinion).

DePinto Drywall has not shown, however, that Kaufmann abused the qualified privilege by acting with "reckless disregard" as to whether his statement was false. At his deposition, Kaufmann testified that "as part of the large investigation we talked to Pulte about each of their developments, dialed into what painters were doing, as we do any complaint investigation." Kaufmann Dep. 95:5–9. Kaufmann explained that Sherwin-Williams "worked through each development of Pulte's . . . [a]nd yes, we would have some minor cracking at those others that Procaccio, Sellergren, and Ecker [other painting contractors] all were able to work through

without having to scrape drywall paper and paint off. And they were able to quickly sand if there was any cracking and deliver acceptable quality closed homes." *Id.* at 95:13–96:3. Kaufmann also testified that he was aware that Ecker had experienced "some minor cracking" but that this was not "the same type of problem" experienced at Winchester Glen. *Id.* at 88:5–11; *see also* Kaufmann Decl. ¶¶ 3–4. Kaufmann's understanding was that Ecker was able to adjust its application procedures to minimize the problem. Kaufmann Dep. 89:10–22. He also stated that Sherwin-Williams was not receiving "the [same] amount of complaints" from Ecker, Procaccio, or Sellergren regarding the 6901 paint. *Id.* at 98:13–19. According to Kaufmann, Ecker, Sellergren, and Procaccio were able to use the 6901 paint "with success" in 2006 and 2007. *Id.* at 99:1–15. Thus Kaufmann's testimony regarding other contractors' use of the 6901 paint is consistent with the statement that he made to the Pulte employees on September 6, 2006.

DePinto Drywall asserts that, contrary to Kaufmann's assertion, as of June 2006 Sherwin-Williams had received complaints from other developments in Chicago as well as developments in California, Arizona, Kansas City, and Indiana. *See* Pls.' Stmt. ¶¶ 33–35. Even if DePinto Drywall's assertions are true – a fact that Sherwin-Williams vigorously disputes – plaintiffs have not shown that Kaufmann knew of the complaints or was reckless in failing to investigate additional complaints. Nor has DePinto Drywall cited any portion of Kaufmann's testimony that would indicate that Kaufmann believed that other contractors in Chicago had not been able to use the 6901 paint successfully. For these reasons, DePinto Drywall has not demonstrated that the qualified privilege was abused. Kaufmann's statements to Pulte regarding other contractors' experiences with the 6901 paint are not actionable. *See Anglin* v. *Sears*

*Roebuck & Co.*, No. 93 C 3438, 1998 WL 483524, at *8 (N.D. Ill. Aug. 10, 1998) ("[A]buse of a qualified privilege cannot simply be asserted to defeat a motion for summary judgment. Plaintiff has the burden to provide sufficient evidence to create a genuine issue of material fact; absent such evidence, summary judgment is appropriate.").

### 2. Statements Regarding The Cause Of The Paint Problems At Winchester Glen

The core of DePinto Drywall's defamation claim is that Sherwin-Williams falsely told Pulte that DePinto Drywall had applied the paint in excess of the recommended thickness, thereby causing the problems at Winchester Glen. DePinto Drywall is not specific, however, in describing the statements that are allegedly actionable. *See* Pls.' Mem. at 14 (stating simply that "Sherwin-Williams told Pulte on numerous occasions and in numerous ways that the problem was caused solely by DePinto's faulty application"). The record indicates that the allegedly defamatory statements were made on three occasions.

First, on September 18, 2006, Henderson, Revnew, and Karnstein met with Pulte representatives and discussed the fact that excessive film build was one of the causes of the paint problems. According to DePinto Drywall, "it was slanted by Sherwin-Williams that the contractor was the major culprit and the issue was not happening with other contractors or other markets with the same paint." Pls.' Stmt. ¶ 81. Sherwin-Williams moves to strike this statement on the grounds that it is hearsay. Sherwin-Williams is correct. DePinto Drywall merely quotes an email from Coffey, a Pulte employee, to other Pulte employees. The email is hearsay and is not admissible under one of the exceptions to the hearsay rule.[12] DePinto Drywall also cites

---

[12] Plaintiffs do not state which exception to the hearsay rule would apply. Because the email was written
(continued...)

Henderson's deposition in support of their assertion that defamatory statements were made at the September 18 meeting. Henderson testified that he "d[idn't] know exactly what they said" about whether other contractors were having problems with the 6901 product. Henderson Dep. 103:4–7. He agreed, however, that the Sherwin-Williams representatives "would have" told Pulte that "the main issue . . . in Chicago was the excessive film build." *Id.* at 102:12–24, 103:1–3. The court will consider only Henderson's testimony regarding the excessive film build.

Second, on September 21, 2006, Kaufmann met with Pulte representatives, including John Martinie, and stated that he had a paint sample from lot 134 that "appeared to be . . . 12 mils dry." Martinie Dep. 155:2–9.[13] Kaufmann also stated that "a lot" of the other samples from Winchester Glen "were extremely high in the sense that they were well above the 7 to 9 or 8 mils that they should have been." *Id.* at 155:10–15.

Third, on October 2, 2006, Kaufmann and Revnew met with Pulte representatives and

---

[12](...continued)

by a Pulte employee, whose interests are not aligned with Sherwin-Williams, it does not qualify as an admission of a party-opponent. *See* Pulte's Answer & Crossclaims Against Sherwin-Williams, Dkt. #22; Fed. R. Evid. 801(d)(2)(D); *Weinstein's Fed. Evid.* § 801.30[1] ("[T]he statements must be offered against the party who made them . . . . It is generally held that a party's statements may not be admitted under this rule against another party on the same side of the litigation as the declarant party."); *Young* v. *James Green Mgmt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003). Nor is the email admissible as a business record. *See* Fed. R. Evid. 803(6) (requiring that a record be "kept in the course of a regularly conducted business activity").

[13] Sherwin-Williams moves to strike Martinie's testimony on the grounds that it is hearsay and that Martinie testified inconsistently regarding what Kaufmann said and produced. Martinie's testimony regarding what he heard Kaufmann say is not hearsay because it is not being offered to prove the truth of Kaufmann's statements. *See Porter*, 2003 WL 22416702, at *2; *Schindler*, 474 F.3d at 1011. Nor is Martinie's testimony internally inconsistent: he initially testified that he could not recall everything that Kaufmann discussed at the meeting but then, after he was shown a copy of the email that he drafted the next day, he recalled the additional details that the court considers here. Sherwin-Williams's motion to strike is denied.

Vincent DePinto to discuss the paint problems at Winchester Glen and DePinto's outstanding invoices. At that meeting, Revnew and Kaufmann displayed micrographs and paint samples from lots 116 and 118 that showed that the paint from those lots measured 18 to 23 mils dry film thickness. Revnew stated that all of the samples that Sherwin-Williams tested were 18 to 23 mils dry film thickness.[14] Kaufman stated that DePinto Drywall was "not applying the paint properly" and that the "microscopy doesn't lie."[15]

Taking the context of these statements into account, and drawing all reasonable inferences in favor of DePinto Drywall, the court concludes that the statements that were made on September 18 and 21, and October 2, were defamatory *per se* because they impugn DePinto Drywall's professional ability. The statements are not protected opinion because their meaning, that DePinto Drywall was not applying the paint properly, was readily understandable and objectively verifiable. Nor are they capable of an innocent construction.

Because the statements are protected by a qualified privilege, however, DePinto Drywall must show that the various speakers either knew that the statements were false or acted with reckless disregard to the truth of the statements. DePinto Drywall has not submitted evidence that creates a genuine issue of fact with respect to this issue. With respect to the September 18 meeting, DePinto Drywall has not demonstrated which Sherwin-Williams representative made

---

[14] Sherwin-Williams moves to strike ¶¶ 132 and 133 from plaintiffs' statement of additional facts, which describe assertions attributed to Revnew and Kaufmann, on the grounds that the statements are not consistent with Vincent DePinto's affidavit and/or his deposition testimony. The motion to strike is denied. The court has noted the inconsistencies, which are minor, and will consider only those statements that are supported by Vincent DePinto's affidavit and are consistent with his deposition testimony.

[15] Kaufmann denies that he made the statements attributed to him. *See* S-W Resp. to Pls.' Stmt. ¶¶ 130–39. For the purpose of deciding defendants' motions for summary judgment, however, the court must view any disputed fact in the light most favorable to plaintiffs.

the defamatory statements and has not submitted sufficient evidence regarding the participants' "subjective state of mind." *Miller*, 569 N.E.2d at 1167. Kaufmann, who made several statements at the September 21 and October 2 meetings, provided testimony at his deposition regarding the information and data he received from Sherwin-Williams's Breen Technical Center. DePinto Drywall has not cited any portion of Kaufmann's deposition to indicate that Kaufmann thought that the information he received from Sherwin-Williams's lab was false or that it required additional investigation in the field or in the lab. Nor is it reasonable to conclude that Kaufmann, who was a marketing executive, should have taken it upon himself to verify the data he received from the lab. Indeed, DePinto Drywall argues in its response to Sherwin-Williams's statement of facts that Kaufmann was not qualified to testify regarding the details of the Sherwin-Williams investigation because, as a "former used car salesman," he lacked personal knowledge of the underlying tests. Finally, DePinto Drywall does not cite any evidence that relates to Revnew's "subjective" understanding of the paint issues at the time of the October 2 meeting.

DePinto Drywall alleges generally that "micrographs and analytical reports . . . were revised and altered" in the Pulte Investigation Report and that the data presented to Pulte on October 2 had been doctored to "exaggerate the purported thickness of the paint samples." *See* Pls.' Mem. of Law at 9, 10. The relevant statements of facts, *see* Pls.' Stmt. ¶¶ 83–119, 121–24 (*cited in* Pls.' Mem. at 9) and 133–34, 37 (*cited in* Pls.' Mem. at 10), do not support the inference that Sherwin-Williams published falsified data to Pulte on the three occasions

described above.[16]  DePinto Drywall has not demonstrated that Kaufmann, Revnew, or the

participants in the September 18 meeting either knew that their statements were false or acted

with "reckless disregard" regarding the truth of their statements.  Therefore the statements

regarding the cause of the paint problems at Winchester Glen are not actionable because they are

protected by a qualified privilege.

### 3.     Statement That DePinto Drywall "Overcharged" Pulte

DePinto Drywall asserts that Kaufmann defamed DePinto Drywall by stating that

Vincent DePinto "overcharged" Pulte by $60,000 or $80,000 for the repairs done at Winchester

Glen. DePinto Drywall has not attempted to demonstrate the falsity of this statement, much less

that Kaufmann knew that the assertion was false or had recklessly failed to investigate the issue

at the time when he made the statement.  Kaufman has testified consistently that he thought that

DePinto Drywall's invoices were "high" due to unnecessary repairs.  Kaufmann Dep.

246:2–247:1; Kaufmann Decl. ¶ 8. DePinto Drywall has not presented evidence sufficient to

create an issue of fact as to whether the qualified privilege that protected Kaufmann's statements

to Pulte was abused.  For the foregoing reasons, Sherwin-Williams's motion for summary

judgment with respect to Count IV will be granted.

### B.     Defamation Claim Against Pulte

DePinto Drywall cites three statements made by Pulte employees in support of its

---

[16] Martinie's September 22, 2006 email to Pallardy does not provide evidence that Kaufmann knew that his statements were false.  Even if Martinie's measurements are accepted as correct, plaintiffs have not explained why Kaufmann, who is in the marketing department at Sherwin-Williams and is not a lab technician, should have second-guessed the accuracy of any micrographs or reports that he brought to the meeting.  Martinie, moreover, acknowledged that he had no way of disputing mil readings that would have been contained in the reports that he saw at the September 21 meeting with Kaufmann.  Martinie Dep. 226:19–227:11.

defamation claim against Pulte. First, on September 18, 2006, Kelly Zentner, one of Pulte's superintendents, said to Vincent DePinto, "Did you guys learn how to paint yet or are you still putting the paint on backwards?"[17] V. DePinto Aff. ¶ 79. This statement was made in the presence of other Pulte and DePinto Drywall employees. Zentner's statement is non-actionable opinion because it does not have a readily understood meaning and is not objectively verifiable. *See Manjarres* v. *Nalco Co.*, No. 09 C 4689, 2010 WL 918072, at *3–4 (N.D. Ill. Mar. 9, 2010) (statements that plaintiff was "unprofessional" and "incompetant" were non-actionable opinion); *Haywood*, 169 F. Supp. 2d at 916 (statement that employee was "unstable" was not objectively verifiable and therefore not actionable); *Hopewell* v. *Vitullo*, 701 N.E.2d 99, 104, 299 Ill. App. 3d 513, 233 Ill. Dec. 456 (1998) (statement that plaintiff was "fired because of incompetence" was nonactionable opinion because broad scope of the term "incompetent" lacks necessary detail to have a precise and readily understood meaning); *cf. Kolegas* v. *Heftel Broad. Corp.*, 607 N.E.2d 201, 207, 154 Ill. 2d 1, 180 Ill. Dec. 307 (1992) (statements that cartoon festival producer "was not for real," that producer was "scamming" radio listeners, and that "there was no such show as the classic cartoon festival" had natural and obvious meaning and were not subject to innocent construction).

Second, Robert Burns, the former foreman at Winchester Glen for DePinto Drywall, testified at his deposition that he heard Mike Hausler, the area construction manager for Pulte Homes, tell an unidentified employee of Procaccio that the problems at Winchester Glen were due to DePinto Drywall's poor application of the 6901 paint. Burns Dep. 149:20–151:20. Burns

---

[17] Pulte argues that this statement is inadmissible hearsay because it is only reported by Vincent DePinto in his affidavit. A witness may testify regarding defamatory statements that were made in his presence by another party. *See Schindler*, 474 F.3d at 1011. Pulte's motion to strike is denied.

testified that he could not give a "precise, word-for-word" description of the statement. *Id.* at

150:16–21. In response to Pulte's motion for summary judgment, DePinto Drywall submitted

affidavit from Burns, in which he avers that although he does not remember Hausler's "exact

words," or the "exact order" of Hausler's words, the "gist" of what Hausler said was that

"DePinto fucked up the paint job" and that DePinto was "the cause" of "all of this." Burns Aff.

¶ 3.[18] The assertion that DePinto Drywall "fucked up the paint job," like the assertion that

DePinto Drywall put the paint on "backwards," does not have a precise meaning and is non-

actionable opinion. *See Brown* v. *GC Am., Inc.*, No. 05 C 3810, 2005 WL 3077608, at *7–8

(N.D. Ill. Nov. 15, 2005) (statements that plaintiff "f-ed up" the company, "was incompetent,"

and "had no ability" were considered non-actionable opinion); *Hopewell*, 701 N.E.2d at 104 (an

"easily understood" term is not actionable where "its broad scope renders it lacking the

necessary detail for it to have a precise and readily understood meaning").

Third, DePinto Drywall cites statements allegedly made to homeowners by Nick Jawnyj,

Pulte's customer service manager at Winchester Glen. At his deposition, Jawnyj testified that

"the general managers" told him to tell homeowners that the problem was due to a product

defect, but then later told him to say that the paint was applied incorrectly. Jawnyj Dep. 72–74.[19]

---

[18] Pulte moves to strike the statements that rely on Burns's affidavit on the grounds that his affidavit is contradicted by his deposition testimony. *See, e.g.*, *Amadio* v. *Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001); *Buttron* v. *Sheehan*, No. 00-C-4451, 2003 WL 21801222, at *4 (N.D. Ill. Aug. 4, 2003). Burns's testimony that he could not recall Hausler's statements "word-for-word" does not substantially contradict the clarification in his affidavit regarding the "gist" of what Hausler said. *Cf. Amadio*, 238 F.3d at 926 (affidavit contradicted deposition where plaintiff initially testified that he never told anyone in management that he was handicapped and never had a "difficult conversation" with his employer, but then submitted affidavit detailing the contents of the allegedly difficult conversation). Pulte's motion to strike is denied.

[19] Pulte moves to strike the statements that rely on this portion of Jawnyj's testimony on the grounds that
(continued...)

23

Jawnyj initially testified that he did not "believe" his own statements at the time he made them, *id.* at 82:1–11, but later admitted that, as a customer service manager, he did not have the knowledge or skills to determine whether the 6901 paint was bad or if the paint had been applied improperly, *id.* at 133:5–16. Jawnyj could not recall the exact words that he used and could not identify the homeowners he talked to.

DePinto Drywall has also submitted an affidavit from Sonia Jaime, a homeowner at Winchester Glen who spoke to Jawnyj about the cracking paint. Jaime testifies that she moved into Winchester Glen in August 2006 and that her house was painted on Labor Day weekend. According to Jaime, when the painters first arrived at her house they "notified [her] that the paint on [her] walls previously applied by Pulte Homes was defective." Jaime Aff. ¶ 2. Over the next several months, Jaime had multiple conversations with Jawnyj about the cracking paint in her home. At first, Jawnyj told Jaime that "Pulte did not know if it was the painter's fault at application or if it was a bad batch of paint." *Id.* at ¶ 4. Sometime in early 2007, however, Jawnyj told Jaime that "Pulte believed it was a bad batch of paint but Sherwin-Williams was saying it was DePinto painters who did not apply the paint properly." *Id.* at ¶ 5.

Jawnyj's testimony that he told unspecified homeowners that the paint "wasn't applied properly" does not create a genuine issue of material fact. "To prevail on a claim of defamation, mere speculation concerning the defendant's words is simply not enough. Plaintiff must

---

[19](...continued)
the statements regarding what his supervisors told him is hearsay. Because the testimony regarding Jawnyj's supervisor's instructions is not being submitted to prove the truth of the matter asserted, *i.e.*, that the problems at Winchester Glen were or were not due to defective paint, they do not need to be excluded under the hearsay rule. *See, e.g.*, *United States* v. *Linwood*, 142 F.3d 418, 425 (7th Cir. 1998) ("If . . . an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the hearsay rule does not apply." (quoting *Lee* v. *McCaughtry*, 892 F.2d 1318, 1324 (7th Cir. 1990)). Pulte's motion to strike is denied.

affirmatively establish publication of the defamatory statement." *Martinez* v. *U-Haul Co.*, No. 99 C 8066, 2001 WL 648637, at *18 (N.D. Ill. Jun. 6, 2001) (citing *Gibson* v. *Phillip Morris, Inc.*, 685 N.E.2d 638, 644, 292 Ill. App. 3d 267, 226 Ill. Dec. 383 (1997)); *see also Medallion Prods., Inc.* v. *McAlister*, No. 06 C 2597, 2008 WL 5046055, at *12 (N.D. Ill. Nov. 20, 2008) ("A claim for defamation *per se* requires that the alleged defamatory statement be so 'obvious and apparent on its face [that] injury to the plaintiff's reputation may be presumed.'" (quoting *Muzikowski* v. *Paramount Pictures Corp.*, 477 F.3d 899, 904 (7th Cir. 2007))).

The statements described in Jaime's affidavit are not actionable because they are reasonably capable of an innocent construction. *See Pope*, 95 F.3d at 613. Jaime asserts that Jawnyj told her that "Pulte believed it was a bad batch of paint but Sherwin-Williams was saying it was the DePinto painters who did not apply the paint properly." The natural and obvious meaning of Jawnyj's statement is that DePinto Drywall might have applied the paint improperly or the paint might have been defective. Moreover, it is not clear that any portion of Jawnyj's summary of the situation was false.[20] For these reasons, neither Jawnyj's testimony nor Jaime's affidavit creates a genuine issue of fact with respect to DePinto Drywall's defamation claim against Pulte. Pulte's motion for summary judgment on Count IV will be granted.

## II.     Interference With Prospective Economic Advantage - Count V

Count V of plaintiffs' complaint alleges a claim for interference with prospective economic advantage on behalf of DePinto Drywall. In order to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must show that (1) he had a

---

[20] Of course, Jaime's statement as to what Jawnyj told her about what Sherwin-Williams "was saying" is inadmissible if offered to prove that Sherwin-Williams was, in fact, making the statements Jawnyj attributed to it. *See Martinez*, 2001 WL 648637, at *18.

reasonable expectation of entering into a valid business relationship; (2) the defendant knew of this expectancy; (3) the defendant purposefully interfered and thereby prevented the plaintiff's expectancy from being fulfilled; and (4) the plaintiff suffered damages as a result. *See, e.g.*, *Adelman-Reyes* v. *St. Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007); *Fellhauer* v. *City of Geneva*, 568 N.E.2d 870, 878, 142 Ill. 2d 495, 154 Ill. Dec. 649 (1991).

Every builder who has been deposed or submitted an affidavit in this case has testified that he or she never had any communication with either Pulte or Sherwin-Williams regarding Winchester Glen and never heard any disparaging statements regarding DePinto Drywall's work. Pulte's Stmt. of Material Facts ("Pulte's Stmt."), at ¶ 29. Indeed, DePinto Drywall "admit[s] that [it has] no direct evidence of statements by Pulte to a builder or a prospective customer." Plaintiffs' Resp. to Pulte's Stmt. of Material Facts ("Pls.' Resp. to Pulte's Stmt."), at ¶ 26. At his deposition, Vincent DePinto did not identify any occasions when a builder told him that DePinto Drywall was not hired for a particular job because of its reputation.[21] Mariella DePinto did not identify any builder that stated to her that they were not going to award a contract to DePinto Drywall because they heard disparaging remarks about its work. In addition, every builder who has been deposed or submitted an affidavit in this case has testified that contracts with DePinto Drywall were terminated or rebid because of the need to reduce costs, particularly because of the residential housing crisis and DePinto Drywall's anticipated price increase. *See* Pulte's Stmt.

---

[21] The court will not consider the statements contained in ¶¶ 72 and 126 of plaintiffs' statement of additional facts, which have been submitted to show that Pulte and Sherwin-Williams intended to ruin DePinto Drywall financially. The statements are based on hearsay reported by Vincent DePinto and do not constitute admissible evidence.

26

¶ 30.[22]

DePinto Drywall argues that, based on Hausler's comment to a Procaccio employee that DePinto Drywall "fucked up the paint job," a jury could "reasonably infer" that Pulte also defamed DePinto Drywall to building contractors who then terminated or rebid their contracts with DePinto Drywall.[23] DePinto Drywall cannot rely on generalities to create a genuine issue of material fact. *See Kumaran* v. *Brotman*, 617 N.E.2d 191, 202, 247 Ill. App. 3d 216, 186 Ill. Dec. 952 (1993) ("[T]he plaintiff must allege business relationships with specific third parties."); *see also Hoopla Sports & Entm't, Inc.* v. *Nike, Inc.*, 947 F. Supp. 347, 357 (N.D. Ill. 1996). DePinto

---

[22] The relevant testimony, which uniformly supports defendants' motion, is as follows. Eric Borg, the vice president of purchasing for Ryland Homes ("Ryland"), testified that Ryland rebid jobs that had previously been done by DePinto Drywall because Ryland "was not willing to accept a 15% price increase from DePinto Drywall." Borg Dep. 31:3–12, 32:15–21. Don Coates, the former customer service manager for Centex Homes ("Centex"), testified that DePinto Drywall was replaced with another painting contractor who offered to perform work for Centex at a substantial discount and that this was "solely a corporate decision based upon the need to reduce costs, nothing more." Coates Aff. ¶¶ 3–8. Andy Stern, the senior vice president for Toll Brothers, testified that DePinto Drywall gave Toll Brothers a notice of a 5% price increase in May 2007, that Toll Brothers replied that it could not accept any price increases due to the reduction of new home sales in its region, and that Toll Brothers subsequently terminated its contract with DePinto Drywall after DePinto Drywall stated that it could not continue working on Toll Brothers's contracts without the price increase. Stern Aff. ¶¶ 5–9. Lon Marchel, the regional vice president for Kirk Homes ("Kirk"), testified that Kirk did not renew its contract with DePinto Drywall because Kirk could not agree to DePinto Drywall's price increase due to "economics" and the fact that the "home building industry is in a depression." Marchel Dep. at 15:13–24, 16:1–20, 26:15–24, 27:1–7. Kirk rebid the contract and awarded the work to another contractor at a price comparable to DePinto Drywall's pricing prior to DePinto Drywall's request for a price increase. *Id.* at 27:8–18. Kirk has not received any new bids from DePinto Drywall during the past two years. *Id.* at 23:2–11. Teresa Lynn Bateman, director of contracts and customer service for Wiseman Hughes, testified that her company could not agree to a price increase for DePinto Drywall because of the economic downturn. Bateman Dep. 35:3–10. Fewer homes were being sold and the number of Wiseman Hughes employees was reduced from 85 to 17. *Id.* at 11:8–22, 33:1–17. Michael Meyers, the vice presdient of purchasing for Lakewood Homes, testified that a contract that DePinto Drywall had bid on in July 2007 was awarded to another contractor after DePinto Drywall was not wiling to reduce the amount of its price increase. Meyers Dep. 16:12–22, 62:4–14.

[23] DePinto Drywall cannot bring a claim against Pulte for interfering with future business that DePinto Drywall expected to receive from Pulte. *See Douglas Theater Corp.* v. *Chicago Title & Trust Co.*, 681 N.E.2d 564, 569–70, 288 Ill. App. 3d 880, 224 Ill. Dec. 249 (1997).

Drywall's assertion that it does not need to provide "direct evidence" of Pulte's interference with a particular business relationship is not supported by the cases DePinto Drywall cites in its response. *See, e.g.*, *Veco Corp.* v. *Babcock*, 611 N.E.2d 1054, 1060 243 Ill. App. 3d 153, 183 Ill. Dec. 406 (1993) (holding that the employer had a valid claim for breach of fiduciary duty because the record showed that the defendant employees had actively solicited the customer's business before they left the plaintiff's employ).

DePinto Drywall also asserts, without providing citations to the record, that Sherwin-Williams's "deliberate deceit and disparagement" caused Pulte to terminate its contractual relationship with DePinto Drywall and that "this is precisely what Sherwin-Williams intended." As discussed *supra*, Section I.A, DePinto Drywall has not demonstrated that Sherwin-Williams deliberately deceived Pulte. Nor has DePinto Drywall demonstrated that it had a specific contractual expectancy with Pulte. For the foregoing reasons, defendants' motion for summary judgment with respect to Count V will be granted.

**III.    Intentional Infliction Of Emotional Distress ("Outrage") - Count VI**

In Count VI of their complaint, plaintiffs assert a claim of intentional infliction of emotional distress on behalf of Vincent DePinto individually. DePinto asserts that Sherwin-Williams caused him severe emotional distress by falsifying lab results and reports regarding the paint problems at Winchester Glen and by falsely stating that DePinto Drywall applied the paint at Winchester Glen incorrectly. DePinto asserts that Pulte caused him severe emotional when it refused to pay DePinto Drywall for work done at Winchester Glen.

Defendants respond, citing *Kush* v. *Am. States Ins. Co.*, 853 F.2d 1380, 1383 (7th Cir. 1988), that Vincent DePinto cannot bring a claim for intentional infliction of emotional distress

regarding actions that were directed at DePinto Drywall, a corporate entity. In *Kush*, the court of appeals held that the sole shareholder and chairman of a corporation could not bring a claim of intentional infliction of emotional distress against the corporation's insurance carrier. The court concluded that traditional shareholder standing rules, as well as the law governing the tort of intentional infliction of emotional distress, precluded the court from "disregard[ing] the corporate form by treating [the plaintiff] as the de facto insured party." *Id.* at 1383. Courts in this and other jurisdictions have relied upon the shareholder standing rule to bar individual tort retaliation claims, *Chicago United Indus., Ltd.* v. *Chicago*, No. 05 C 5011, 2007 WL 4277431, *10–11 (N.D. Ill. Dec. 3, 2007) (citing *Kush*), claims for tortious interference with a prospective business advantage, *Ferrer* v. *Carricarte*, 751 F. Supp. 1032, 1033–35 (D. Puerto Rico 1990) (citing *Kush*), and claims for tortious interference with the plaintiff's business, *Sirinakis* v. *Colonial Bank*, 600 F. Supp. 946, 954 n.10 (S.D.N.Y. 1984).

DePinto does not dispute that defendants' alleged conduct was directed only at DePinto Drywall, but assert that *Kush* is inapplicable because he is not a shareholder in DePinto Drywall.[24] In *Kush*, however, the court did not rule on the basis of shareholder standing alone. It concluded that "the law governing emotional distress claims and the shareholder standing rules are mutually reinforcing" where the defendant's relationship was solely with the corporation, and not the individual plaintiff. *Kush*, 853 F.2d at 1383. DePinto has cited no evidence showing that defendants had an individual relationship with him or a duty to him that was distinct from

---

[24] DePinto also argues that the court should apply an exception to the shareholder standing rule, citing *Bevelheimer* v. *Geirarch*, 339 N.E.2d 299, 33 Ill. Ap. 3d 988 (1975). *Bevelheimer*, which explains that a corporation and a shareholder may be regarded as a single entity where there is evidence of fraud, deception, or "a compelling public interest," *id.* at 304, does not support DePinto's claims for intentional infliction of emotional distress.

his role as manager of DePinto Drywall. Indeed, the defamation claim that forms the factual predicate for DePinto's emotional distress claim is asserted only on behalf of DePinto Drywall in plaintiffs' complaint. Under these circumstances, DePinto cannot bring a claim for intentional infliction of emotional distress based solely upon conduct that was directed at DePinto Drywall, a corporate entity. *See id.* ("Kush asks us to disregard the line between shareholder and corporation . . . . We are reluctant to do so here, where the direct duty was owed to the corporation alone and the allegedly tortious acts were directed only at the corporation."). Defendants' motion for summary judgment with respect to Count VI will be granted.

## CONCLUSION AND ORDER

Sherwin-Williams and Pulte's motions for summary judgment with respect to Counts IV, V, and VI [#184, 187] are granted. Counts IV, V, and VI are dismissed with prejudice. This case is scheduled for a status hearing on March 24, 2011.

Dated: March 9, 2011          Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge